UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MICHELLE COLLINS | CIVIL ACTION |
| VERSUS | NUMBER: 18-4923 |
| NANCY A. BERRYHILL, ACTING COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION | SECTION: "H" (5) |

**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying Plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability. (Rec. docs. 16, 17).

Michelle Collins, Plaintiff herein, filed the subject applications for DIB and SSI benefits on June 26, 2015, alleging disability as of July 20, 2012. (Tr. pp. 159-164; 165-171).[1/] Those applications were denied at the initial level of the Commissioner's administrative review process on August 25, 2015. (Tr. pp. 103-106). Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on January 25, 2017 at which Plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and

---

[1/] At the outset of the administrative hearing that was ultimately held in this matter, Plaintiff's counsel was allowed to amend the alleged disability onset date to June 28, 2013, the day following another Administrative Law Judge's ("ALJ") denial of a previous set of applications for Social Security benefits Plaintiff had filed. (Tr. pp. 28-29). The ALJ's decision of June 27, 2013 is part of the administrative record below, as is the subsequent denial of review by the Appeals Council ("AC"). (Tr. pp. 62-71, 76-78). Even if Plaintiff had not formally amended the alleged onset date in this case, principles of *res judicata* would have established that she was not disabled prior to June 28, 2013. *Califano v. Sanders*, 430 U.S. 99, 107-97 S.Ct. 980, 985-86 (1977). The Court notes that the benefits applications at issue in this lawsuit are no less than the fifth set of such applications that Plaintiff has filed. (Tr. pp. 81, 93, 181-182).

testified. (Tr. pp. 109-110, 23-58). On April 6, 2017, the ALJ issued a written decision in which she concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 7-22). The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on March 22, 2018, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-6). It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1382(c)(3).

In her cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

> 1. The Administrative Law Judge improperly concluded that [P]laintiff's headaches do not constitute a severe impairment.
>
> 2. The Administrative Law Judge failed to properly consider medication side effects.
>
> 3. There is [a] lack of substantial evidence that there are jobs in significant numbers that [P]laintiff can perform.
>
> (Rec. doc. 16-1, pp. 1-2).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

> 1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2016.
>
> 2. The claimant has not engaged in substantial gainful activity since June 28, 2013, the amended alleged onset date (10 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: obesity, diabetes mellitus, depressive disorder, and anxiety (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity

of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except standing and/or walking is limited to two hours in an eight-hour workday, and she could not tolerate pushing with the bilateral lower extremities. The claimant must avoid extreme heat (defined as 80 degrees or higher) and wetness/humidity. She can perform tasks commensurate with a specific vocational preparation (SVP) level of two or less, and would be limited to occasional interaction with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 4, 1970 and was 42 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1568 and 416.968).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404,1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from the amended alleged onset date of June 28, 2013 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 12, 13, 15, 17, 18).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1970). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which…has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of

4

performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings;

2. An individual who does not have a "severe impairment" will not be found to be disabled;

3. An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4. If an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made;

5. If an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner finds that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

Plaintiff's first challenge to the Commissioner's decision is that the ALJ erred in failing to find that her migraine headaches were a severe impairment at the second step of the §§404.1520/416.920 sequential analysis. Plaintiff argues that she suffers from significant and frequent migraine headaches; that she testified at the administrative hearing that she stopped working because of her headaches; that she has been hospitalized for migraine headaches in the past; and that the ALJ who considered one of her previous sets of applications for Social Security benefits found that her headaches were a severe impairment. Plaintiff further argues that the ALJ's failure to find that her migraines were a severe impairment "… taints the ALJ's ultimate opinion and prejudices [her] case;" that the hypothetical questions submitted to the VE by the ALJ at the administrative hearing contained no limitations attributable to migraines, thus rendering the hypotheticals invalid; and that the ALJ failed to consider Plaintiff's migraines in assessing her residual functional capacity. (Rec. doc. 16-1, p. 2).

In her written decision of April 11, 2017, the ALJ properly recalled her regulatory obligation at step two of the §§404.1520/416.920 analysis, as follows:

> At step two, I must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the [R]egulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521 and 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

(Tr. p. 11).

Later in her decision, the ALJ found that Plaintiff suffered from severe impairments in the form of obesity, diabetes mellitus, depressive disorder, and anxiety. (Tr. p. 12). Conversely, Plaintiff's HIV, hypertension, and migraine headaches were found to be non-severe. (Tr. pp. 12-13). As respects the latter condition, the ALJ cited to objective medical evidence of record that Plaintiff's migraine headaches were noted to be stable on Topamax and that a CT scan of her head revealed a normal-appearing brain and associated structures. (Tr. p. 13). The ALJ further cited to Plaintiff's testimony at the hearing that she only suffered a headache approximately once every two or three weeks and they lasted about an hour. (*Id.*). Plaintiff's reliance on her purported hearing testimony that she stopped working due to migraines is unavailing in and of itself because a claimant's subjective complaints must be supported by competent medical evidence, *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994), and a claimant's statements, standing alone, are insufficient to establish even the existence of an impairment. 20 C.F.R. §§404.1528(a), 416.928(a). Moreover, the following transcript excerpts do not support the reading that she suggests:

> Q    Why did you stop working?
>
> A    When I would get migraine headaches, I was hospitalized.
>
> Q    Okay. Did you lose your job because of that or did they fire you? Did you quit? How did that happen?
>
> A    They just laid me off.
>
> Q    Okay. You had told me earlier, is it true that before that they had reduced your hours?
>
> A    They was having me work at one day.

Q    One day a week?

A    One day a week.

Q    Do you know why?

A    No, I don't know why.

Q    Okay.

A    They just cut my hours down.

        * * * * * * * * * * * * * * * * *

Q    And then I know you had the problem with headaches, how often do you have a headache?

A    Ever so often.  It might come up and go away.

Q    Right.  Well in an average week let's say, do you have one every week at least?

A    Like every three weeks I might have a headache.

Q    Okay.  One headache every three weeks?

A    Might be every three or two weeks, I might get one.

Q    Okay.  And how long does it last when you get one?

A    Like, for an hour.

Q    What do you take?  Do you take anything for your headache?

A    No, they ain't never gave me nothing for the headaches.

Q    Okay.  And you said you stopped working because of your headaches?

A    No, they just laid me off.

Q    But you said you went to the hospital because of them.

A    Yeah, I went to the hospital for my headaches.

> Q    Okay, Is that the only time you went to the hospital for your headaches?
>
> A    I went to the hospital twice with migraine.
>
>           \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
>
> Q    When you were working at New Orleans Hamburger and Seafood, before you got laid off, were you making any sort of mistakes that you knew of?
>
> A    No, ma'am.
>
> Q    Okay. Did your employers ever talk to you about any problems that they had with the way you did your work?
>
> A    No, ma'am.
>
> Q    Were you ever disciplined for any reason?
>
> A    No, ma'am.
>
> Q    So far as you know, I mean, you mentioned you were laid off. Do you have any idea what the reason you were laid off was?
>
> A    No, ma'am.
>
> Q    They didn't give you an explanation?
>
> A    They didn't give me no explanation.
>
> Q    So do you think that you could go back to doing that work at New Orleans Hamburger and Seafood?
>
> A    I really don't know.
>
>                                         (Tr. pp. 33-34, 35-36, 48-49).

It thus appears that Plaintiff stopped working for reasons unrelated to her actual ability to perform job-related duties. 20 C.F.R. §§404.1566(c), 416.966(c). Next, Plaintiff points to page 319 of the administrative record as proof that her migraine headaches were indeed severe because she was reportedly hospitalized for them. The cited medical record,

however, does not document an in-patient hospital stay but is instead an outpatient treatment note dated February 13, 2014 from the Interim LSU Public Hospital where Plaintiff was seen for follow-up care of her HIV and poorly-controlled diabetes mellitus. (Tr. pp. 319-324). Admittedly, the note does reference that Plaintiff had recently been admitted to Ochsner for two days with complaints of a headache but her blood pressure was extremely elevated at the time and, after adjustments were made to her hypertension medication, she had not had a headache since then.[2]/ In any event, Plaintiff had no complaints at the time of this outpatient visit and the diagnosis contained no mention of migraine headaches. (*Id.*). This documentary evidence provides little support for the proposition that Plaintiff's migraine headaches were a severe impairment.

Plaintiff additionally argues that an ALJ who considered one of her previous sets of applications for Social Security benefits had found that her migraines were a severe impairment. The Court is unable to re-examine the time period that was at issue in that previous set of benefits applications (*see* note 1, *supra*) and Plaintiff points to no medical evidence generated during the relevant time period in this case that establishes that her migraine headaches significantly affected her ability to perform work-related activities. Moreover, while the previous ALJ may have found that Plaintiff's migraines were a severe impairment, she ultimately found that Plaintiff was not disabled due to that condition, another condition, or any combination of conditions. As for the contention that the ALJ's hypothetical questions to the VE contained no limitations attributable to Plaintiff's migraines, the Court first notes that Plaintiff fails to identify, even at this late date, any specific limitations that are attributable to her migraines. *Heck v. Colvin*, 674 Fed.Appx. 411,

---

[2]/ Records of the two-day stay at Ocshner were not admitted in the administrative proceedings below.

10

414 (5th Cir. 2017). The Court further recalls that an ALJ may properly rely upon the testimony of a VE if the hypothetical question posed to the VE reasonably incorporates all disabilities recognized by the ALJ and the claimant is afforded the opportunity to correct perceived deficiencies in the ALJ's question by mentioning or suggesting to the VE any purported defects in the hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).

In the present case, the ALJ posed a hypothetical question to the VE which, *inter alia*, included an avoidance of extreme heat and wetness/humidity and a limitation to only occasional interaction with the public. (Tr. pp. 55-56). In answer to that question, the VE identified three jobs that the individual described in the hypothetical question could perform. (Tr. pp. 56-57). Although given the opportunity to suggest to the VE any limitations resulting from her migraine headaches, Plaintiff chose not to do so. (Tr. p. 57). Plaintiff should not now be heard to complain of the adequacy or completeness of the ALJ's hypothetical question to the VE when it was not deemed important enough to merit adversarial development in the administrative proceedings below. *See*, e.g., *Masterson v. Barnhart*, 309 F.3d 267, 273-74 (5th Cir. 2002); *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000); *Bowling*, 36 F.3d at 436; *Perrera v. Colvin*, No. 16-CV-1131, 2017 WL 2829695 at *9 (S.D. Tex. June 28, 2017); *Johnson v. Astrue*, No. 11-CV-3030, 2012 WL 5472418 at *14-16 (E.D. La. Oct. 5, 2012), *adopted*, 2012 WL 5472303 (E.D. La. Nov. 9, 2012)(and cases cited therein). In light of the body of objective and subjective evidence that was before her, and in the absence of any specific migraine-related limitations articulated by the Plaintiff, the Court believes that the ALJ properly discharged her regulatory duty of assessing Plaintiff's residual functional capacity. 20 C.F.R. §§404.1527(d)(2), 404.1546(c), 416.927(d)(2), 416.946(c).

Finally and most importantly, inasmuch as consideration of Plaintiff's applications for Social Security benefits proceeded past step two of the §§404.1520/416.920 sequential analysis and were not summarily denied at that step based on the fact that she did not suffer from a severe impairment, Plaintiff's first challenge provides no basis for disturbing the Commissioner's decision. *Dise v. Colvin*, 630 Fed.Appx. 322, 324 (5th Cir. 2015); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987); *Chaparro v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987); *Wagner v. Astrue*, No. 08-CV-0519, 2010 WL 546739 at *7 (E.D. La. Feb. 12, 2010).

Plaintiff's second challenge to the Commissioner's decision is that the ALJ failed to consider the side-effects of her medication. Citing only her administrative hearing testimony and one finding rendered by a consultative psychological examiner, Plaintiff argues that "[t]here is significant evidence in the record regarding the side effects of [her] medications." (Rec. doc. 16-1, p. 3). Plaintiff complains that while the ALJ did include in her hypothetical question to the VE that she would be off-task due to medication side effects, the ALJ did not include medication side effects in other hypotheticals when describing her residual functional capacity. The purported failure of the ALJ to properly consider her medication side-effects, Plaintiff suggests, warrants a remand of her case.

At the January 25, 2017 administrative hearing, the following testimony was elicited from Plaintiff by her attorney:

> Q     Okay. Did any of your medicines cause you any kind of side effects? Do you know what that means?
>
> A     No.
>
> Q     Do any of them make you feel any certain way?
>
> A     It make me feel like drowsy and I go to sleep.

> Q   Okay.  Do you know which one of your medicines makes you feel that way?
>
> A   I don't know which one.
>
> Q   Okay.  How often does that happen?
>
> A   Like every two weeks, it make me drowsy and sleepy.
>
> Q   Every two weeks?
>
> A   No I mean, like every week.
>
> Q   Uh-huh.  Does it happen every day or just some days?
>
> A   Some days.
>
> Q   Okay.  And when it makes you drowsy, how long do you feel drowsy?
>
> A   Like for two hours, it make me feel drowsy.
>
> Q   Mm-hmm.  And do you fall asleep?
>
> A   Yeah.
>
> Q   How many times in a normal day, how many times do you think you fall asleep?
>
> A   Once or twice.
>
> Q   Okay.  And how long do you normally sleep when you fall asleep?
>
> A   About a hour.
>
> Q   Okay.  Do you know why you fall asleep?
>
> A   I guess because of the medicine I'm taking.
>
> (Tr. pp. 36-37).

After being tendered to the ALJ, Plaintiff was queried regarding her prescribed medications as follows:

13

Q      What medicines are you taking right now besides your insulin?

A      I'm taking Metformin, lebrenenal (PHONETIC).

Q      What is that?

ATTY: Lisinopril?

CLMT: Yes, Lisinopril.

ALJ:   Lisinopril. Okay.

ATTY: That's for blood pressure, right?

CLMT: Mm-hmm.

Q      All right, what else?

A      Some kind of shampoo for my, for my face and some kind of cream.

Q      All right. And why do you use a cream and a shampoo for your face?

A      Because I had, my face broke out.

Q      Okay. With? Was it lesions? Was it acne? What was going on with your face?

A      It was like, I had went to take a haircut and at the haircut, my face just started breaking out.

Q      Okay. When did that happen?

A      About a month ago.

Q      Is that the first time that happened?

A      Yeah, it was the first time it happened.

Q      Are the only medications that you're usually on, besides those, are Metformin and Lisinopril?

A      Yes.

Q Does Lisinopril control your blood pressure?

A Yes.

Q Do you take your blood pressure at home?

A Yes.

Q And what does it typically run?

A Like 128 over 60.

Q How often do you take it?

A Every other day.

Q Do you also measure your blood sugar?

A Yes.

Q Do you do it in the morning?

A I do it in the morning, evening and at night.

Q Okay. What does it typically run in the morning?

A Three hundred.

Q That's what it is usually?

A Mm-hmm.

Q Is that yes?

A Yes.

Q Okay. Has your insulin dosage been adjusted?

A My insulin dose?

Q Yes. In other words, has the doctor increased the amount of times you take insulin in a day or given you more?

A Yes, she brought it up to 12 units.

Q Twelve units.

15

| | |
|---|---|
| A | And I take the other insulin at night and that's like 46 units. |
| Q | When was it adjusted to 12 units and 46 units? |
| A | About a month ago. |
| Q | Okay. |
| A | When I went back to the doctor. |

       * * * * * * * * * * * * * * * * *

| | |
|---|---|
| Q | And you mentioned, your attorney was asking about what you did during the day, you mentioned that you watch TV and that you slept. |
| A | Mm-hmm. |
| Q | And you also told me that you would fix yourself something simple to eat if you needed to, if your sister wasn't there. Is that correct? |
| A | That's correct. |
| Q | Other than that, how do you spend your time? Are you, I mean, are you sleeping all day long? Watching TV all day long? Or what else – – |
| A | I sleep like an hour and a half, then I get up, I might watch TV like for five minutes and I dose right back off. |
| Q | Okay. And you think that's because of your medications? |
| A | Yes, ma'am. |

                             (Tr. pp. 45-57, 53).

In making an assessment of Plaintiff's residual functional capacity, the ALJ first summarized Plaintiff's hearing testimony, including that "[h]er medications reportedly make her drowsy and cause her to sleep once or twice in a normal day for about an hour each time." (Tr. p. 15). "[H]owever," the ALJ continued, "… the claimant's statements concerning the

16

intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. p. 16). The ALJ then discussed the medical records pertaining to Plaintiff's treatment for diabetes, obesity, depression, and anxiety, the conditions that she had found to be severe. (Tr. pp. 16-17). Just like Plaintiff's supporting memorandum, absent from the ALJ's discussion were any references to any contemporaneous complaints Plaintiff may have made to any of her treating physicians regarding medication side-effects which might provide corroboration for her hearing testimony. After summarizing the opinion evidence and a Third-Party Function Report from Plaintiff's mother, the ALJ opined as follows:

> In sum, the above residual functional capacity assessment is supported by Exhibits B-4 A/8-9 and B-6 A/8-9, the medical evidence as summarized above, and that portion of the claimant's testimony supported by the medical evidence of record. In so finding, I note there were inconsistencies between the claimant's testimony regarding activities of daily living and what was reported in the medical evidence of record, as well as [a] suggestion that the claimant's symptomatology was exaggerated. For example, consultative psychologist Luscher noted that the claimant "appeared to be feigning during the mental health status examination tasks in an attempt to present as impaired" (Exhibit B-1F/3). With regard to activities, she reported at West Jefferson Behavioral Health Center that she lives with her mother, nieces, and nephews and takes care of them (Exhibit B-3F/4, 6). She also mentioned at Jefferson Parish Human Services Authority that she takes care of her ailing mother (Exhibit B-8F/6). In a Function Report, the claimant corroborated this statement (Exhibit B-3E/2). However, she testified that she does [not] care for others and relies on them to care for her and do the household chores. Given such inconsistencies, I look to the objective medical evidence for resolution, and credit the claimant's testimony to the extent that it is consistent with the aforementioned residual functional capacity.
>
> (Tr. p. 17).

17

As the foregoing demonstrates, contrary to the situation presented in *Loza v. Apfel*, 219 F.3d 378, 296 (5th Cir. 2000), a case upon which Plaintiff relies, the ALJ in this case did elicit testimony from Plaintiff regarding the types, dosages, effectiveness, and side-effects of the medications that she was taking. Admittedly, the psychologist who consultatively evaluated Plaintiff did note that "[s]he appeared to be having medication side effects that affect cognitive processing" and that "[s]he showed evidence of slowed thought processes possibly due to medication side effects." (Tr. pp. 235-236)(emphasis added). However, the evaluator also remarked that "Ms. Collins appeared to be feigning during the mental status examination tasks in an attempt to present as impaired." (*Id.*). In any event, the psychologist found that Plaintiff's overall memory functioning was adequate, that her attention and concentration appeared intact, and that she was able to perform simple tasks. (Tr. p. 236). Consistent with those findings, the ALJ assessed Plaintiff having the residual functional capacity to perform a limited range of light-level work involving simple tasks with an SVP of two or less and with only occasional interaction with the public. In short, the ALJ found that the limitations that Plaintiff testified to at the administrative hearing, including those related to medication side effects, were simply not supported by the objective evidence of record. This was the ALJ's prerogative in the first instance. *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991); *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 129 (5th Cir. 1991); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). And as was noted earlier (*see* p. 11, *supra*), despite the VE being tendered to Plaintiff's counsel to question him on any medication-related limitations, counsel chose not to do so. This challenge is without merit.

Plaintiff's third and final challenge to the Commissioner's decision is that there is a lack of substantial evidence supporting the ALJ's conclusion that there are a significant number of jobs available in the economy that Plaintiff is capable of performing.

At the fifth step of the §§404.1520/416.920 analysis, the Commissioner may discharge her burden of proving that work exists in significant numbers that a claimant can perform by, *inter alia*, relying on the testimony of a VE. *Fraga*, 810 F.2d at 1304. In the present case, the ALJ posed a hypothetical question to the VE that assumed an individual of Plaintiff's age, education, and work experience who was capable of the limited range of work described in the residual functional capacity assessment that the ALJ deemed was adequately supported by the objective evidence of record. (Tr. pp. 55-57). In answer to that question, the VE identified the following jobs that existed in the noted numbers that the described individual could perform: thread separator – 5,740 in Louisiana and 420,910 in the United States; sorter – 6,330 in Louisiana and 434,170 in the United States; and bench hand – 6,450 in Louisiana and 235,910 in the United States. (*Id.*). In the Fifth Circuit, those numbers easily sustain the Commissioner's burden at step five of the sequential analysis. *Dominguez v. Astrue*, 286 Fed.Appx. 182, 188 (5th Cir. 2008); *Lirley v. Barnhart*, 124 Fed.Appx. 283, 284 (5th Cir. 2005); *Monroe v. Shalala*, 55 F.3d 633, 1995 WL 313965 at *8 (5th Cir. 1995)(table); *Heck v. Colvin*, No. 15-CV-3483, 2016 WL 4004577 at *19 (E.D. La. Apr. 6, 2016), *adopted*, 2016 WL 3971007 (E.D. La. Jul. 25, 2016), *aff'd*, 674 Fed.Appx. 411 (5th Cir. 2017); *Taylor v. Colvin*, No. 14-CV-0573, 2015 WL 3603957 at *4 (E.D. La. Jun. 5, 2015).[3]

---

[3] With the exception of substituting the name of the current Plaintiff, the Court notes that Plaintiff's counsel unsuccessfully advanced this very same challenge, verbatim, in another Social Security proceeding some three years ago. *See* rec. doc. 14, pp. 20-21 in *Heck v. Colvin*, No. 15-CV-3483 "E"(2). Unlike fine wine, the challenge does not appear to have improved with the passage of time.

19

**RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[4]

New Orleans, Louisiana, this 3rd day of January, 2019.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[4] *Douglass* referenced the previously-applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.